Filed 9/5/24  In re R.R. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.R. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>A.R.,<br><br>    Defendant and Appellant. | E082936<br><br>(Super.Ct.Nos. J283196, J283197, & J285218)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Cara D. Hutson, Judge.  Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Dawn M. Martin, Deputy County Counsel, for Plaintiff and Respondent.

1

A.R. (father) lost custody of his children R.R., D.R., and S.R., (collectively, children) all of whom were under the age of three, in 2019 due to chronic domestic violence. The domestic violence was reported by A.M. (mother) who also had mental health and substance abuse problems that led to the intervention by the San Bernardino County Children and Family Services (CFS) and the institution of proceedings pursuant to Welfare and Institutions Code section 300, subdivision (b)(1).[1] Services were provided to both parents, to whom the children were returned temporarily during the course of the dependency, but they were re-removed after a new incident of domestic violence in which mother was the instigator, and a supplemental petition (§ 387) led to a finding that the services had been ineffective in overcoming the domestic violence issue.

Father's progress was otherwise noted, such that even at that point, return of the children to his custody was considered as a permanent plan. However, when the children, who had been placed with a nonrelative extended family member (NREFM), had to be moved from that placement, they were placed with a relative in Texas, impacting father's ability to visit face-to-face. Later, the children were moved to a foster home in California, where father was not provided with regular visitation. At the section 366.26 hearing to select and implement a permanent plan of adoption, the court found there was no beneficial parent-child relationship between father and the children, and it terminated father's parental rights. Father alone appeals.

---

[1]     All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

On appeal, father argues the trial court erred in permanently severing the parent-child relationship where he had established a beneficial parent-child relationship pursuant to section 366.26, subdivision (c)(1)(B)(i); alternatively, father argues reversal is required because CFS failed to provide him with adequate visitation. We affirm.

## BACKGROUND

On November 16, 2019, mother brought 15-month-old D.R. and six-month-old R.R. to the hospital for a cough, disclosing to the staff that there was domestic violence at home during the visit. She described both physical and verbal altercations with father, including multiple incidents of rape by father; she also indicated she was currently pregnant and was having suicidal thoughts. Hospital staff placed mother on a section 5150 hold, and an emergency response referral was made.

While the children were being examined, hospital staff also observed her "'dicing'" something with a card and bringing the paper up to her nose. Mother was hostile to staff and made statements about not wanting D.R. Mother also admitted that despite the violence and being raped, she returned to father because she had no family or other means to be on her own. She acknowledged mental health diagnoses of depression and anxiety but was not on medication.

Respecting the children, the emergency response social worker noted that R.R.'s head was flattened and that he was unable to sit up on his own or hold his head up. Mother indicated possible Cherokee ancestry on her mother's side. Mother reported the paternal grandmother watched R.R. but left him in his crib because she did not want the child to become attached to her. The emergency response social worker interviewed the

3

father and paternal grandparents; father denied mother's allegations of domestic violence, asserting she was lying in order to have him arrested. The father and paternal grandmother claimed mother is bipolar and abuses drugs, indicating that the maternal grandfather buys drugs for mother. The paternal grandmother indicated she is the primary caretaker for the children.

Based on the circumstances presented, a detention warrant was requested and issued to pick up the children. The children were placed with a NREFM. On November 19, 2019, a dependency petition was filed, alleging the children came within the description of dependent children under section 300, subdivisions (b)(1), and (g). Specifically, the supporting facts of the petition alleged the children were at risk due to mother's substance abuse problem (B-1), mother's history of domestic violence (B-2), her history of mental health problems (B-3), and her failure to meet the children's basic needs, insofar as R.R. could not sit up on his own and has a flattened head, placing the children at risk. As to father, the supporting facts of the petition included allegations relating his history of domestic violence (b-5), his mental health history (b-6), and his failure to meet R.R.'s basic needs. The allegation under section 300, subdivision (g), related to the fact mother left the children without providing for their care when she was involuntarily placed in a section 5150 hold.

On November 20, 2019, the parents appeared for the detention hearing and denied the allegations of the petition; the court found that a prima facie case had been established and ordered the children detained with the NREFM.

The jurisdiction report contained additional information about the domestic violence history of father and mother, including a 2018 incident in which father struck mother's face so hard that it was temporarily paralyzed on one side. The paternal grandparents, with whom the parents and children resided, indicated that mother was the instigator in the violent episodes. Regarding the allegations that the parents failed to provide for R.R.'s basic needs, mother indicated they had taken the child to a pediatrician regarding his flattened head, who advised them to place him on his stomach more; additionally, a special helmet had been ordered, but the parents did not follow through with the treatment. In the meantime, the foster mother indicated R.R. was able to sit up and roll on his side.

In preparing for the jurisdiction report, the social worker requested to see the room where the parents slept at the paternal grandparents' home. There were numerous holes in the walls and in the door of the room. Father indicated that mother punched the walls and that other people had used the room, thereby having the opportunity to cause damage, but he continued to deny responsibility.

On January 28, 2020, the court conducted the contested jurisdictional/dispositional hearing, when it sustained the petitions as to each child under section 300, subdivision (b)(1),[2] ordered reunification services for both parents and separate supervised visits for a minimum of one time per week for two hours.

---

[2]     The court dismissed the allegation in paragraph b-6 as to father (relating to father's alleged mental health history), as well as the allegation pursuant to section 300, subdivision (g).

5

The parent's third child S.R. was born in May 2020, and became the subject of a sibling petition under section 300, subdivision (j). At that point, mother indicated she was not smoking marijuana, although the reporting party indicated mother tested positive for methamphetamine use, although she had participated in services. Mother's services provider indicated she had tested negative for drugs consistently, had completed her life skills and parenting programs, and had attended an additional parenting class. The social worker for R.R. and D.R. confirmed mother's progress, indicating that a recommendation would be made to transition her to family maintenance services for R.R. and D.R.

Father reported he had completed anger management, domestic violence education and parenting classes. However, father had to redo his counseling because he needed to understand why his children were removed from his care. The social worker for R.R. and D.R. also confirmed that father had to redo his counseling, due to his inability to acknowledge the reasons why they were removed from his care. At the detention hearing for S.R. the court ordered S.R. to be removed from father's custody, but maintained S.R. in mother's care. The jurisdiction report for S.R. recommended maintenance of S.R. in mother's care, but that S.R. be removed from father's custody with reunification services.

The status review report recommended that R.R. and D.R. remain in their out-of-home placement, with an order for continued services. That report also indicated mother informed the social worker she was an enrolled member of a tribe. Mother had made good progress on her plan, was working as a custodian, completing parenting, domestic violence and therapy, had been compliant with CFS and had attended all visits. Father was working at Amazon and was also participating in services, having completed

6

parenting, anger management, and domestic violence; he was also testing negatively for drugs, completing his therapy. Additionally, he visited the children regularly and interacted with them. Father brought food to the children, played games with them and was patient with the children; D.R. was described as "Daddy's girl." The social worker recommended transitioning to unsupervised visits slowly.

As to R.R., he was now wearing a helmet due to concerns about his cranial formation and was delayed in speech, as well as with his ability to grasp things. As to D.R., she appeared to suffer from anxiety and stress and compulsively ate to the point of vomiting. D.R. was described as active and subject to tantrums. In a separate jurisdiction report respecting S.R., father's visits with S.R. were also found to be positive with the notation that father took good care of S.R., he changed her diaper, made her a bottle, and held her with affection.

On July 27, 2020, the petition filed on behalf of S.R. was amended so that the allegations pursuant to section 300, subdivision (j), referred to the fact that each parent had an open reunification case respecting R.R. and D.R. CFS continued to recommend a disposition of removal of S.R. from father with maintenance of S.R. in mother's custody.

On July 28, 2020, the six-month review hearing was called, and the matter was set for a contested hearing as to R.R. and D.R. R.R. and D.R. were ordered maintained in their current placement, with authorization to allow mother to have a 29-day visit with R.R. and D.R., while also authorizing (separately) a 29-day visit for father after two successful overnight visits. That same day, the court conducted the jurisdiction/disposition hearing for S.R. The parents entered denials as to the amended

petition, and the matter was set as a short cause, with the same authorizations for separate extended visits for each parent.

On September 22, 2020, the social worker submitted an additional information report (also referred to as Form 6.7) to the court. The social worker noted the parents' positive changes and indicated that the current plan was for father to have the children during the week, while mother would have them on the weekends due to her recent surgery, as well as her schedule of working and going to school during the week. Based on these positive developments, on September 23,[3] at the contested six-month review hearing the court ordered R.R. and D.R. placed in the custody of the parents separately, on separate maintenance plans, with authorization for the parents to reside together and for dismissal of the dependency by approval packet. At the same time, the court ordered S.R. placed in the custody of both parents separately, on separate maintenance, with the same authorizations for the parents to reside together and for the matter to be dismissed upon approval packet.

On March 12, 2021, the social worker's 12-month review report recommended dismissal of the dependency and that the children remain with the parents. Father continued to live with his parents, working at night, while his parents cared for the children. Mother was working during the week in Los Angeles, but on the weekends the children were with her at a hotel. The parents were in a relationship, but lived separately

---

[3] On that same date, the trial court made written findings that ICWA (Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.)) did not apply because notice had been given to the tribes and no response had been received after 65 days. There is no indication of follow up after mother stated she was an enrolled member of a tribe.

for a year without any domestic violence and the families of each parent have been working well together.  They all wanted to be together as a family.

However, matters took a turn for the worse before the case could be closed, when a section 387 supplemental petition was filed as to the children on March 23, 2021.  The supplemental petition alleged mother was using drugs, continued to engage in domestic violence with father, and that father continued to engage in domestic violence, indicating the previous disposition had been ineffective.  The detention report indicated the parents and the children were residing with the paternal grandmother and paternal aunt (where they had lived since August 2020), until the parents became involved in a domestic dispute and were kicked out of the home.  Mother reported the family moved into a motel for a few days when father informed mother that he intended to take the children back to the previous foster mother, but instead he took them to the home of paternal grandmother.  Mother reported that father threatened to take the children to Texas.  Mother reported there had been incidents of domestic violence throughout the parents' relationship, with the last incident occurring a few weeks prior to the current dispute when she sustained bruised ribs.

During the investigation of this referral, father denied the current allegations of domestic violence and also denied being in a relationship with mother.  He denied going to a motel with mother and the children, indicating the children had been with him in the home, where they stayed with him from Monday through Thursday, and he had been waiting for mother (who has the children Friday through Sunday) to pick up the children, but that mother had not contacted him.  On March 20, 2021, a detention warrant was

obtained due to mother's homelessness, the reports of domestic violence, and the possibility the parents were not being forthcoming about their relationship and housing situations. The children were removed from father, placed in a confidential foster home (the home of the previous NREFM placement), and following a contested detention hearing were ordered detained from father. The court ordered weekly visits of two hours duration at the hearing.

In the jurisdiction report respecting to the supplemental petition, the social worker recommended dismissal of some of the allegations, but that there was sufficient evidence to sustain the petition as to the first allegation (respecting mother's drug use). For the remaining allegations, the social worker recommended true findings and a disposition order of removal of custody from the parents with no reunification services. Attached to the jurisdiction report were the concurrent planning/adoption assessments for the children, indicating that the allegations fit the criteria for an order for no reunification services and concluding the children were adoptable. The report indicated mother had not complied with the existing drug testing orders and admitted to heroin use. Mother informed the social worker the parents had been living together at the paternal grandmother's home in violation of previous court orders. The foster parent (who is part of the parents' support network) disclosed that prior to this referral, mother had showed up at the foster parent's home and appeared to be using drugs. Additionally, mother stated to the foster parent that she had reported father for different things in order to get the children removed from him.

Father disclosed that there had been an argument but that only mother had been kicked out of the paternal grandmother's home after provoking the paternal aunt. He stated he took the mother and the children to a hotel where he left the children with her because it was her visit time. However, he did not feel comfortable leaving the children in the room while mother smoked marijuana in a parked car. He then took the children from the hotel room to the home of the support person. According to father, mother had not lived with him since August 2020, prior to the detention hearing to cover for her. The report indicated that father's visits were going well and when the visits ended D.R. cried because she did not want the visit to end.

The supplemental petition was amended on April 23, 2021, and the parents entered denials. The hearing on the supplemental petition scheduled for June 10, was continued to allow CFS to assess the home of the maternal grandmother, who lived in Texas, pursuant to the Interstate Compact for Placement of Children (ICPC).

The social worker's addendum report indicated father had been compliant with services and maintained communication with CFS. The social worker indicated father's visits went well, that he was incorporating the foster mother's parenting suggestions, and he was able to work with the children at one time. Father was unhappy that the maternal grandmother was being evaluated for placement of the children due to her lack of interest in the children before CFS intervened. Mother continued to do poorly, used drugs, and did not participate in any services. Mother attended visits regularly, and, while her ability to control the children was wanting, they were excited to see her and sad when visits

11

ended.  Mother also disapproved of the proposal to evaluate the maternal grandmother for placement.

Nevertheless, the maternal grandmother visited the children regularly, although they did not appear to have a bond with her, in that they did not appear to feel comfortable around her, were reserved, shy, and uncommunicative.  Further, the social worker had reservations about whether the maternal grandmother was an appropriate placement option for the children.  Nevertheless, the ICPC process was under way.  In the meantime, the children were well bonded with the NREFM caretaker/foster mother, who was willing to provide long term care for the children.  The foster mother indicated she suspected the maternal grandmother was making false reports of abuse or neglect in order to strengthen her application for placement, and this was confirmed after the Children's Assessment Center conducted an examination of R.R. following a referral by the maternal grandmother and found no evidence of abuse or neglect.

On August 9, 2021, the jurisdiction/disposition hearing on the supplemental petition was continued with orders authorizing CFS to initiate the ICPC evaluation and to permit in-person visits between the children and the maternal grandmother, in Texas, as appropriate.

On October 18, 2021, the social worker submitted a Form 6.7 to the court, addressing the assessments of other relatives for placement of the children; a paternal uncle was ruled out due to his unwillingness to have the children placed with him, and a maternal aunt was deemed an inappropriate placement due to the history of animosity between her and the mother.  During this reporting period, father continued to cooperate

with CFS, submitted drug tests, and began attending meetings at Al-Anon to better deal with mother's substance abuse issues. In addition, he continued to visit regularly and to improve his parenting style with the children. The Form 6.7 indicated the NREFM caregiver was no longer a concurrent planning home and recommended a plan of placement with the NREFM with a permanent plan of return of the children to father's custody.

On October 19, 2021, the contested jurisdiction/disposition hearing on the supplemental petition was completed. The court made true findings on all the allegations of the amended supplemental petition, found the previous disposition had not been effective in alleviating the causes that led to the dependency, removed custody of the children from the parents, terminated reunification services, except for a one-time discretionary set of six months of services as to the father, and continued the authorization for the ICPC evaluation of the maternal grandmother's home for placement of the children.[4] However, the court agreed that the previous permanent plan was no longer appropriate and adopted the recommendation for placement of the children with the NREFM and a permanent plan of return of the children to father. Additionally, the court ordered that the children's visits with the maternal grandmother will be supervised, with the possibility of being reverted to unsupervised if referrals were unsubstantiated. The court ordered a further contested jurisdiction/disposition hearing as to S.R.'s

---

[4]    Because S.R. was born after initiation of the dependency proceedings related to R.R. and D.R., the orders on the supplemental petition do not include information about her permanency planning.

dependency to address some unrecognized legal issues, specifically, there had not been a finding of jurisdiction as to S.R.[5]

On October 28, 2021, a new dependency petition was filed respecting S.R., with allegations relating to mother's substance abuse and the ongoing dependency of S.R.'s siblings involving both parents. The detention report recommended detention with the NREFM caretaker of the children, but the removal cited only the events preceding the adjudication of the supplemental petition. The parents denied the petition at a special hearing.

The jurisdiction report recommended true findings on the allegations of the petition respecting S.R., removal of custody from both parents, and reunification services to both parents. S.R. was placed in a foster home separate from R.R. and D.R. after the NREFM indicated she was not interested in caring for S.R. The jurisdiction/disposition report described father's progress and his cooperation with CFS as good, and his visits were deemed great. The social worker noted father had a couple of unsupervised visits

---

[5]     Although an original dependency petition had been filed, S.R. was removed only from father, but never detained away from mother, and her case trailed the six-month status review hearings of her older siblings, R.R. and D.R. At the siblings' six-month review hearings, the matter was continued, and the parents were granted separate extended visits. S.R.'s case, set for a jurisdiction/disposition hearing was also continued. In August 2020, the parents' separate extended visits with R.R. and D.R. was continued again, as was the jurisdiction/disposition hearing on S.R. On September 23, R.R. and D.R. were ordered returned to the parents' separate custody, with authorization for the parents to reside together, while S.R. was maintained with mother and returned to father. However, the minute order for S.R. did not include jurisdictional or dispositional findings or orders; instead, it is captioned a six-month review hearing at which the court ordered S.R. *continued* to be a dependent, and maintained in the custody of both parents, separately. So jurisdiction was never established as to S.R. prior to the initiation of the section 387 proceedings.

and that the children enjoyed their time with him.  Regarding the maternal grandmother, the social worker reported that she had not requested visits with the children since October 20, 2021.  Prior to that date, the maternal grandmother's visits had gone well, but the children had not bonded with her.

On November 19, 2021, the court conducted the further jurisdiction/disposition of S.R. in conjunction with a special hearing, as to referrals regarding the maternal grandmother.  The court reinstated the maternal grandmother's unsupervised visits and dismissed the section 387 petition as to S.R.  S.R. was then adjudicated a dependent child, removed from her parents' custody and placed in foster care.  Reunification services were ordered for both parents as to S.R.  Father was granted unsupervised visits one time per week, for eight hours each, as to all three children.

On December 10, 2021, a supplemental petition pursuant to section 387 was filed as to R.R. and D.R. when the NREFM was no longer willing or able to care for the children.[6]  The NREFM's decision was due to the escalating behaviors of D.R., whose behavior had deteriorated into throwing more tantrums, acting aggressively against R.R. and S.R. and damaging property in the home.  The children were moved together to a new foster home.  Relatives were not considered for placement due to the nature of the children's needs.  On December 13, the parents denied the allegations of the supplemental petition and the court ordered the children removed from the home of the

---

[6]    The supplemental petition alleges this need for a higher level of care applied to all three children, although S.R. had initially been in a separate placement.

15

NREFM.  Visitation for father remained the same, one time per week, for eight hours, unsupervised.

On January 11, 2022, the social worker submitted to the court Form 6.7 in connection with the jurisdiction/disposition hearing on the supplemental petition.  That report indicated that father's unsupervised visits, which included overnight visits, went well, and that D.R. asked if she could stay with her father, upon returning to the foster home.  At the hearing, the court made a true finding on the supplemental petition, relating to the need for a new placement.  It removed custody from the NREFM and ordered the children placed in a foster family agency home.  However, it authorized an extended visit for father with the children.

By January 31, 2022, after only 20 days the extended visit came to an abrupt halt when, as described in an addendum report Form 6.7 filed on April 19, father was arrested for domestic violence after hitting mother and causing a broken nose.  The social worker reduced father's visits to once per week for two hours, supervised, and instructed father to do his services again.  The social worker recommended that father's services be terminated as to R.R. and D.R. and that a section 366.26 hearing be set.

That same day, a postpermanent plan status review report (§ 366.3) was filed, also recommending that services be terminated for father as to R.R. and D.R. and that a section 366.26 hearing be set for termination of parental rights.  However, the report also acknowledged there were several relatives interested in placement of the children, including the maternal grandmother in Texas who was awaiting completion of the ICPC evaluation.

The report noted that father was still engaged in drug testing, which interfered with his employment, causing job changes, but that his family still provided support and his visits with the children were consistent and positive, with the children enjoying their time with him. In discussing the basis for his arrest in January 2022, father initially claimed to police that mother had lied and denied having contact with her, until the officer confronted father with a message on mother's phone in which mother had attached a photo of her injury, to which father responded, "sorry." He then admitted to the officer he had struck mother.

Nevertheless, the report indicated father's visits with R.R. and D.R. went well, that the children were sad when they had to leave father, and that D.R. especially, was attached to father. The maternal grandmother also visited with the children, and the children returned from those visits with no behavioral issues. In her assessment, the social worker recommended adoption of the children by the maternal grandmother. Yet, on March 8, 2022, CFS submitted a concurrent planning/adoption assessment indicating that there were compelling reasons why termination of parental rights would be detrimental to R.R. and D.R.

At the postpermanent plan review hearing held on April 19, 2022, the court terminated father's discretionary services, authorized unsupervised weekly visits of 12-hours for the maternal grandmother, with authorization to increase her visits to include overnights or weekend visits. It further authorized, CFS to place the children with the maternal grandmother under the ICPC, adopting a permanent plan of guardianship for R.R. and D.R., with her.

On May 18, 2022, the social worker submitted a six-month status review report relating to S.R., recommending that reunification services for the parents be terminated and that a section 366.26 hearing be conducted as to that child. Although father's visits had been reduced, effective March 30, father continued to visit regularly, and the visits were positive. The social worker noted that S.R. had a good relationship with father. The social worker expressed the view that father's domestic violence issue with mother posed a risk to the children, insofar as he and mother did not have a safe relationship because he could not keep himself or the children away from mother. The social worker recommended that S.R. be placed with the maternal grandmother in Texas upon ICPC approval. On May 19, the court adopted the recommendations of the social worker, terminated the parents' reunification services respecting S.R., and adopted a permanent plan of placement of S.R. with a relative and with a goal of adoption. The court also indicated that a paternal aunt had been evaluated for placement but had been found to be inappropriate.

On July 8, 2022, father filed a request to change court order (Form JV-180) (§ 388), checking the box indicating a request for reinstatement of reunification services. However, in his request, father requested that the court consider placement of the children with the paternal aunt, asserting that such a placement was in their best interests because placement with the maternal grandmother was detrimental. Subsequently, a similar request for placement was made in a section 388 request submitted by the paternal aunt. Mother also filed a section 388 request to change court order, joining in the request for

placement of the children with the paternal aunt because placement with the maternal grandmother would be detrimental.

CFS responded, recommending that the requests be denied. Despite concerns by father and the paternal relatives that the maternal grandmother would impede visitation by father and his relatives, CFS reported the maternal grandmother indicated that was not the case; rather, she was open to working with the father and his family. The maternal grandmother supervised mother's virtual visits, but admitted she did not feel comfortable supervising visits with the father or his relatives.[7] The social worker noted that the children's bond with the maternal grandmother was improving, and that they seemed comfortable in her home. She wished to adopt the children.

At the section 388 hearing held on September 27, 2022, father informed the court that one hour of video call with the children was insufficient, and he felt he was losing the bond he once had with them. At that time, the court denied an evidentiary hearing for the separate section 388 requests for change of placement, ordering that the children remain placed with the maternal grandmother in Texas.

On October 14, 2022, the social worker submitted a postpermanent plan review report, recommending a permanent plan of placement in foster care, with the goal of adoption. The report referred to the ICPC approval of the maternal grandmother's home,

---

[7]     The maternal grandmother expressed concern that father and his relatives might make false reports against her, something the maternal grandmother had done in the past with NREFM.

and the children's transfer to her home in July 2022.[8]  The report indicated that D.R. still has behavioral problems and was aggressive towards R.R. and S.R.  D.R. had difficulty adjusting to the change of placement for the first few weeks, because she missed her previous caretakers and her paternal relatives.  But as of the time of the report, she had made progress and was developing a bond with her maternal grandmother.  The maternal grandmother reported that D.R.'s tantrums could last over an hour when she does not get her way, it was necessary to monitor her closely due to her aggressive behavior toward the other children; it was overwhelming.  The children participated in virtual visits with the parents and the paternal relatives for one hour, one time per week.  The social worker indicated an intention to recommend adoption as soon as D.R. is connected to services for her behavior.

At the hearing held on October 14, 2022, father requested increased visitation in order to maintain his bond with the children, because one hour per week over video call was insufficient, and that he had not been able to visit over the past two weeks.  The court ordered that one hour per week visitation was to be a minimum and ordered make-up visits for father.

On February 8, 2023, a new supplemental petition was filed as to D.R., who was now five years of age, alleging that the previous disposition had been ineffective because the maternal grandmother was unable to meet her needs, and seeking a more restrictive level of care for D.R.  The Texas ICPC agency workers determined that D.R. had to be

---

[8]    The report mistakenly indicates the children were transferred in July 2019, but that is obviously a typographical mistake.

returned to California, and she was transferred on October 22, 2022, to a certified intensive services foster care resource parent.

At the hearing on February 9, 2023, the court expressed concern over the accuracy of the CFS reports where the paternal aunt had informed the court at the time of the hearing on the section 388 requests that the maternal grandmother was having difficulty dealing with D.R., but that CFS assured the court there were no issues. The court was also concerned about the delay in bringing the second supplemental petition respecting D.R., which was filed months after the child was removed from the maternal grandmother's home and retransferred to California. The court ordered D.R. removed from her relative placement and temporarily placed in foster care, with visitation for the parents once per week, for two hours.

On March 2, 2023, the court sustained the supplemental petition pursuant to section 387, finding that the previous disposition had been ineffective in the rehabilitation and treatment of the child, approved the placement of D.R., and ordered supervised visitation for father, a minimum of once per week, for one hour, with authorization for two visits per week of two hours. The court found that the permanent plan of legal guardianship with a goal of adoption was the appropriate permanent plan. Father requested increased visits with D.R. and informed the court that he had not had visits with R.R. or S.R. The court ordered CFS to consider visits twice per week for two hours each for father.

On April 12, 2023, the social worker submitted a report for the section 366.3 postpermanent plan review, recommending a section 366.26 hearing to order adoption for

R.R. and S.R., while recommending a permanent plan of placement in foster care with a goal of adoption for D.R. R.R. and S.R. remained in their placement with the maternal grandmother. The social worker reported that D.R. was emotional after visits because "they" dropped her off at school, and that D.R. becomes emotional when her mother does not show up for visits. Father's last visit with R.R. and S.R. was in October 2022, when the maternal grandmother had to change the date due to her work schedule, he became belligerent, and no further visits were scheduled. Father did not contact the social worker during the time frame to seek additional visits. The social worker recommended that R.R. and S.R. be adopted by the maternal grandmother because they had created a positive bond with her and identify as part of the family.

On April 14, 2023, father again reported that there was "an issue with his visitation," and requested that the court reiterate the order that CFS was to arrange make-up visits for father, who was not at fault for missing the visits. The court agreed with the request. Father's counsel objected to the court setting the section 366.26 hearing under these circumstances, where the last video call was disconnected, maternal grandmother stated she did not have service and when father attempted to contact a local social worker for assistance, he was informed there was a new worker assigned to the case. He indicated that a social worker was present during one or more incidents of the video call being disconnected. The trial court advised counsel for the maternal grandmother to discuss its concerns about disconnected video calls at the expense of father's visits. The court ordered CFS to arrange for make-up visits for father, along with a continuation of

22

the visitation schedule of once per week for two hours via video call with directions that the maternal grandmother cooperate.

Meanwhile, father was visiting regularly with D.R., although the social worker indicated father spent considerable time talking to the caretaker and that at the end of visits D.R. separated easily. The monitoring social worker noted D.R. would have a tantrum when she did not get her way and expected gifts at each visit, seeming to look forward more to the gifts than to the visits. The report gave detailed accounts of D.R.'s problematic and aggressive behavior at visits with father and his family, and D.R.'s behavior after visits, but also noted that D.R. stroked father's face and pressed her forehead to his during one visit, and noted the child sat in her paternal grandmother's lap, playing with grandmother's hair, and played with her cousins. D.R.'s current caretakers were interested in legal guardianship or adoption of D.R.

On April 14, 2023, the court ordered a section 366.26 hearing to consider terminating parental rights as to all three children. Pending the section 366.26 hearing, the court ordered visits for father one time per week for two hours, in addition to make-up visits for any visits missed not due to parental fault.

On August 14, 2023, the social worker submitted a section 366.26 report recommending parental rights be terminated as to R.R. and S.R. A separate section 366.26 report was prepared regarding D.R., recommending that she remain in a permanent plan of planned permanent living arrangement due to her changed

23

circumstances.[9]  On August 28, the matter was set as a contested hearing as to all three children.

On October 30, 2023, the social worker submitted to the court an additional information report (Form 6.7), describing the video call visits between the father, R.R., and S.R., were complicated by their young ages and difficulty in maintaining their attention during a virtual visit.  The maternal grandmother reported that R.R. takes about an hour and a half to calm down after a virtual visit with father, while S.R. does not seem to engage.  Neither child asked for father during the interval between visits.  The social worker also reported that D.R.'s caretakers, who also were the caretakers of D.R.'s younger half-sibling, wished to adopt D.R.

The section 366.26 hearing spanned two days, concluding with orders terminating parental rights as to R.R., D.R., and S.R.

On January 4, 2024, father timely appealed.

## DISCUSSION

Father argues that the trial court erred in not finding that termination of parental rights would be detrimental due to the existence of a beneficial parent-child relationship.  (§ 366.26, subd. (c)(1)(B)(i).)  Alternatively, he argues that if we conclude the exception is inapplicable, that we should find that his due process rights were violated because CFS did not facilitate adequate visitation.  We disagree.

---

[9]  D.R. was apparently moved to the home where her infant half-sibling had been placed, in order to "de-parentif[y]" her.  The record does not provide information about the half-sibling other than a few references to "Gunner."  There are no reports of D.R. exhibiting parentified behavior.

24

1. *Father did not meet his Burden of Proving that Terminating Parental Rights Would be Detrimental due to a Beneficial Parent-Child Relationship*

At the hearing to select and implement a permanent plan for the children, father sought to prove that termination of parental rights would be detrimental due to the existence of a beneficial parent-child relationship. One obstacle faced by father was the disconnection or denial of several (the number is not stated in the record) virtual visits after his children were placed in Texas, pursuant to the permanency plan of adoption or legal guardianship of the children by the maternal grandmother. Although make-up visits were ordered, father faced another obstacle: his visits had to be conducted by way of video call (Zoom or Facetime) and it is unclear whether make-up visits were accommodated. For children of tender years (D.R. was five, R.R. was four, and S.R. was three at the time of the section 366.26 hearing), who were easily distractable and difficult to engage on a virtual platform, the visitation did little to promote father's parental relationship with them. But these problems arose late in the dependency process, after father had at least three years of in-person visits with his children, including the liberalized extended visits and the temporary return of the children. By the time the visitation problems manifested, services had been terminated and the case was in postpermanent planning mode.

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of

the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; see *In re Fernando M.* (2006) 138 Cal.App.4th 529, 534, quoting *In re Marilyn H.* (1993) 5 Cal.4th 295, 306.) For this reason, the "'burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions.'" (*In re C.B.* (2010) 190 Cal.App.4th 102, 122, citing *In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.)

Adoption is the permanent plan preferred by the Legislature. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826.) At the selection and implementation hearing, the court must terminate parental rights if the child is likely to be adopted within a reasonable time unless one of the statutory exceptions applies. (§ 366.26, subd. (c)(1)(B)(i)-(vi).) One such exception is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

To establish the beneficial parent-child relationship exception, the parent must show by a preponderance of the evidence three elements: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631, 636 (*Caden C.*), italics omitted.) The parent bears the burden to establish by a preponderance of the evidence that an exception to the statutory preference for adoption applies. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1345.)

In reviewing a finding of a lack of compelling evidence that termination of rights would be detrimental, we follow a hybrid standard of review. (*Caden C.*, *supra*, 11 Cal.5th at p. 641; *In re G.H.* (2022) 84 Cal.App.5th 15, 26.) As to the first two elements, which involve factual determinations, we apply the substantial evidence standard of review. (*Caden C.*, at pp. 639-640.) We review the third element, determining whether termination of parental rights would be detrimental to the child, for abuse of discretion. (*Id.* at p. 640.)

Regarding the first element, described by the court as straightforward, the question is just whether "'parents visit consistently,'" considering "'the extent permitted by court orders.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632, citing *In re I.R.* (2014) 226 Cal.App.4th 201, 212.) Father's visits with D.R. after her transfer to California were regular until sometime shortly before the section 366.26 hearing, when he started a new job. For the most part, those visits were described as good, although D.R. frequently acted out during the visits.[10] For R.R. and S.R. (and D.R. before her return to California), father's visits during the postpermanency phase of the dependency proceedings were limited by the location and logistics of the out-of-state placement and were further impacted by friction with the maternal grandmother. Nevertheless, we assume that father visited regularly, to

---

[10] At the section 366.26 hearing, the social worker mistakenly testified that during one in person visit, father told D.R. he would "whup her." However, this testimony appears related to a visitation summary dated September 1, 2023, in which D.R. told her father, "I am going to whoop your ass," not the other way around. In response, father asked her what she said, and D.R. repeated the statement before running off across the park. When confronted with her error, the social worker apologized.

the extent permitted by court orders, the logistics of virtual visitation, and cooperation by the caretaker.

Regarding the second element, the California Supreme Court recommended that courts assess whether "'the child would benefit from continuing the relationship.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632; see § 366.26, subd. (c)(1)(B)(i).) The court emphasized that the focus is the child, and that the relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, at p. 632, quoting *In re Autumn H*. (1994) 27 Cal.App.4th 567, 576.)

In the present case, the children were quite young and had been out of father's custody for the majority of their short lives, with short intervals in which the children were returned to father's separate custody or when he had an extended visit, comprising six or seven months out of a nearly four-year dependency history. We assume that up until services were terminated following the final removal of the children from father's care, he had a parent-child bond with all three children. But after father's discretionary services were terminated and the permanent plan of placement with the maternal grandmother was adopted, the relationships father had with his children became attenuated due to factors related to their ages, the length of time they had been out of father's custody, as well as the inability to visit in person on a regular basis.

Even D.R., who had been "daddy's girl" before the termination of reunification services, was described as affectionate towards father at one visit only, while she adjusted

28

to her new placement and foster family and began forming a bond with them. For R.R. and S.R., at no time following their placement with the maternal grandmother had the children sought out contact with father, shown distress when visits ended, or asked about father during the intervals between visits. Father failed to establish that the children would benefit from continuing the relationship with him.

Regarding the third element, that is, "whether 'termination would be detrimental to the child due to' the relationship," the Supreme Court indicated a trial court must decide whether it would be harmful to the child to sever the relationship and choose adoption. (*Caden C.*, *supra*, 11 Cal.5th at p. 633, citing § 366.26, subds. (c)(1)(B) & (D).) Here again, father failed to meet his burden where the children do not appear to have experienced any emotional loss or suffering due to their current placements in out-of-home (and out-of-state) care or the limits placed on their contacts with father. At the section 366.26 hearing, father testified that termination of parental rights would be detrimental because the children, particularly R.R. and S.R., would not have a father figure. This was insufficient.

As to D.R., father testified that she eagerly ran to meet him at visits and cried when they ended and because she would ask for him prior to scheduled visit days, but other than his testimony, there is no evidence to support these statements, other than a statement that she was emotional after visits and was emotional when her mother did not show up for visits. To the contrary, the testimony at the termination of rights hearing indicated D.R. called her current caretakers "momma" and "daddy," and that she viewed them as her "own family," and was "significantly bonded to them." The record does

reveal that D.R. was experiencing encopresis and urinary incontinence beginning in March 2023, but there is no evidence in the record linking this issue to separation from father. In its ruling, the trial court interpreted D.R.'s acting-out and "bathroom accidents" as indicators that the parent-child relationship was not beneficial, and there is nothing to contradict this finding.

Sadly, father made efforts to maintain his relationship with his children, and he demonstrated his bond and commitment to them, but the record does not show the children reciprocated to the degree necessary for a court to find a compelling reason that severing the parent-child relationship would be detrimental to them. Father failed to meet his burden of showing that termination of parental rights would be detrimental.

2. *Father's Due Process Rights Were Not Violated*

As set forth, *ante*, after the reunification stage of dependency proceedings has concluded, the focus shifts to permanency and stability for the children. We have explained that this places the burden squarely on parents to demonstrate the existence of a beneficial parent-child relationship. It also means that the child welfare agency is no longer obligated to assist the parent in strengthening the parent-child bond by offering enrichment services or optimizing visitation to preserve family ties. "[A]fter a child has spent a substantial period in foster care and attempts at reunification have proved fruitless, the child's interest in stability outweighs the parent's interest in asserting the right to the … companionship of the child." (*In re Jasmon O*. (1994) 8 Cal.4th 398, 419-421.) In other words, maintaining visitation orders to prevent deterioration of the parent-

30

child relationship and prevent termination of parental rights is not a goal, because by the time the case reaches the postpermanent plan stage, that ship has sailed.

Father does not argue that the virtual nature of the visits or the missed visits were a violation of his substantive due process right to custody of his children. (See *Stanley v. Illinois* (1972) 405 U.S. 645, 651 [parents have a fundamental interest in "the companionship, care, custody, and management of his or her children"].) Instead, he argues that the failure of the court to enforce his visits, and CFS's failure to ensure that visits would not be interrupted by the children's placement in Texas, to which he refers as a "cessation of visitation," "profoundly affected" his ability to "avoid the termination of parental rights."

In this respect, father's argument must fail because he has not established his premise that visits had been terminated, and because the proceedings no longer had a focus on preserving or strengthening the parent-child relationship due to his failure to reunify during the prepermanent planning stage of the proceedings despite the extraordinary opportunities provided to him.

In this respect, father's reference to "cessation of visits" is an attempt to draw an analogy between his circumstance and that involved in the holding of *In re Hunter S.* (2006) 142 Cal.App.4th 1497, on which he relies. In that case, however, the parent was completely deprived of visits for over a year because the child refused to attend visits and the court, not wanting to pressure him, deferred to the recommendation of the child's therapist in not ordering visits, proceeding instead to set the section 366.26 hearing. (*Id.* at pp. 1502-1503.) There, the reviewing court stated, "Courts have long recognized

that, in the context of dependency proceedings, a lack of visitation may 'virtually assure[] the erosion (and termination) of any meaningful relationship' between mother and child. [Citation.] Even after family reunification services are terminated, visitation must continue unless the court finds it would be detrimental to the child. (§ 366.21, subd. (h).)" (*Id.* at p. 1504.)

It bears noting that the circumstances of this case are completely unlike those of *Hunter S.* insofar as father's visitation continued throughout the dependency, including a temporary return of custody and liberalized and extended visits prior to the placement of the children with their maternal grandmother. Father's virtual visits apparently were interrupted for an unknown number of times and for reasons never made clear, but his visits were never terminated. On the other hand, in *Hunter S.*, the finding that the mother's due process rights had been violated was based on the fact the trial court improperly delegated decisions about parental visitation with the child to a therapist and allowed the child to control whether visitation would occur. (See *Hunter S.*, *supra*, 142 Cal.App.4th at p. 1505.)

While father missed visits (apparently between September 30, 2022, and April 14, 2023, although the exact number of missed visits was not mentioned) after the children had been placed out of state in Texas under a permanent plan of adoption, there was an order for regular visits, which took place virtually until D.R. was transferred back to California and in-person visits with her were reinstated. The undetermined number of visits missed due either to technology or the maternal grandmother's conduct, or the friction between the father and the maternal grandmother, were not due to the trial court

32

abdicating its responsibility or to CFS's failure to enforce visits, once they were made aware of the difficulties. The court maintained visitation orders even after the children had been placed with their maternal grandmother in Texas under a permanent plan of guardianship or adoption and ordered make-up visits for those that were missed due to the disconnection or cancellation of virtual call (Zoom or Facetime) visits. CFS took steps to follow up with the maternal grandparent, as the social worker testified at the section 366.26 hearing.

The real problem, as identified by counsel for CFS and the court, was that the children were distractable and difficult to engage on a virtual platform, such that the virtual visits were less meaningful for them. The fault for this does not lie at the feet of the court or CFS, but instead flowed naturally from the children's young ages and the court's need to find a permanent and stable placement for the children when reunification efforts failed.

Father's due process right to continued visitation after services were terminated was not violated.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____
                                                    P. J.

We concur:

FIELDS _____
                        J.
MENETREZ _____
                        J.

34